IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARCI DOLAN,

                             Civil No. 05-3062-CL

          Plaintiff,          REPORT AND RECOMMENDATION

    v.

UNITED STATES OF AMERICA,
et al.,

         Defendants.

CLARKE, Magistrate Judge:

    Plaintiff brings this action against defendants United States of America, Dirk Kempthorne, Secretary of the Interior, the U.S. Department of the Interior, and the Bureau of Land Management ("BLM") alleging claims for sexual harassment/gender discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e et seq., and negligence and invasion of privacy under the Federal Tort Claims Act, 28 U.S.C. § 2679(b)(1).

Plaintiff seeks back and front pay, work related benefits, damages for lost earning capacity, compensatory damages, costs, disbursements, and attorney's fees.  Defendants move for summary judgment (#69).

## I.  **FACTS**

Defendants submit the following facts:

1.  Thomas Mathews' supervisors, Melvin J. Tague and Robert McElwain, never observed him engaging in inappropriate or offensive conduct toward female subordinates prior to September 10, 2003. (Tague Decl. ¶ 2; McElwain Decl. ¶ 3).

2. Mr. Mathews' supervisors were not aware of any incidences or rumors of any incidences of Mr. Mathews engaging in inappropriate or offensive conduct toward female subordinates prior to September 10, 2003.  (Id.).

3. Prior to September 10, 2003, Mr. Mathews had not behaved inappropriately toward Ms. Dolan.  (Cox Decl. Ex. A at 6).

4. Mr. Mathews attended a BLM training session on the prevention of sexual harassment on June 17, 2003, and received a copy of the BLM's "Zero Tolerance" policy on sexual harassment.  (Casey Decl. ¶ 6, Ex. C).

5. During the summer of 2003, a notice was posted in the Lakeview office informing employees of their Equal Employment Opportunity ("EEO") rights and responsibilities.  (Cox Decl. Ex. D at 3-4).

6. Ms. Dolan possessed a government credit card that she had used on a trip to Phoenix, Arizona in June 2003. (Cox Decl. Ex. C at 28:1-2).

7. Ms. Dolan's supervisor notified her that she was authorized reimbursement for travel expenses under the BLM's blanket travel authorization that allowed for reimbursement for all travel expenses for trips over 50 miles, including trips to Lakeview. (Lansdowne Decl. ¶ 2)[1].

8. When Ms. Dolan arrived at Mr. Mathews' house she observed that he was drunk. (Cox Decl. Ex. A at 8).

9. The single incident of sexual harassment occurred at the home of Mr. Mathews on the evening of September 10, 2003, after dinner and drinks. (Cox Decl. Ex. C at 17).

10. The single incident of sexual harassment involved Mr. Mathews-in his boxer shorts – straddling Ms. Dolan, attempting to kiss her, rubbing against her, and propositioning her, and it ended when Ms. Dolan pushed Mr. Mathews off of her. (Cox Decl. Ex. C at 17-18).

11. Ms. Dolan reported the incident to her supervisor on September 17, 2003, and she was referred to the equal employment office ("EEO") counselor and to the employee assistance program. (Cox Decl. Ex. C at 20-21). Ms. Dolan filed a formal complaint on

---

[1]Plaintiff objects to this paragraph arguing that she was not told she had blanket authorization or that she was authorized to seek reimbursement to Lakeview. Plaintiff cites no evidence in support of this argument and the Landsdowne Decl. ¶ 2 supports this paragraph. The court added some details from that declaration to clarify the paragraph.

REPORT AND RECOMMENDATION - 3

December 2, 2003.  (Creighton Decl. Ex. 11 at 48).

12. Ms. Dolan never saw Mr. Mathews again after the incident on September 10, 2003.  (Cox Decl. Ex. A at 3).

13. Upon receiving a written statement from Ms. Dolan, Mr. Mathews' supervisor, Mr. McElwain, investigated the incident and determined that a suspension of 30 days without pay was a proper punishment for Mr. Mathews behavior.  (McElwain Decl. ¶ 5)[2].

14. On December 10, 2003, Mr. McElwain notified Mr. Mathews that the BLM proposed to suspend him for 30 days without pay due to his conduct. (Id.).  Mr. Mathews was told that his mentor duties were being removed and that he was to have no further contact with Ms. Dolan.  (Id. and Ex. A).  Mr. McElwain offered and Mr. Mathews accepted an alternative punishment in lieu of the full 30-day suspension, which included a five day suspension without pay, mandatory substance abuse counseling, waiver of appeal rights, and a prohibition from serving as a mentor.  (Id.).[3]

15. Mr. Mathews served the five day suspension.  (McElwain Decl. ¶ 6).[4]

_____

[2]Plaintiff disputes whether the investigation was prompt. Therefore, the court omitted the word "promptly" from this paragraph.

[3]Plaintiff disputes that the alternative punishment included the condition of no contact with her, but she does not cite to any evidence.  The McElwain Decl. ¶ 5, Ex. A supports that this condition was imposed.

[4]Plaintiff disputes that there is any admissible evidence to support that Mr. Mathews completed the substance abuse program. Exhibit B to the McElwain declaration is not properly authenticated

REPORT AND RECOMMENDATION - 4

16. During the summer of 2003, the BLM had requested that Ms. Dolan initiate the medical examination that was necessary for her conversion to the SCEP program. (Lysne Decl. ¶ 4).[5]

17. Ms. Dolan did not initiate her medical examination when asked to do so in the summer of 2003, but instead initiated it in November 2003. (Lysne Decl. ¶ 5).[6]

18. Ms. Dolan did not receive her medical clearance for service in the 2004 fire season until June 2004. (Casey Decl. ¶ 7).[7]

19. Ms. Dolan was reassigned to the first position that became available after she obtained her medical clearance. (Casey Decl. ¶ 7).[8]

20. Ms. Dolan's supervisor in her new position reported that she was meeting performance standards and adjusting well. (Benefield Decl. ¶ 2).

21. Ms. Dolan was appointed to the SCEP program and signed a SCEP contract in March 30, 2005, that required her to maintain half-time

---

and constitutes hearsay. Therefore, the court excludes this fact.

[5]Plaintiff disputes that the medical examination was necessary, however, the Declaration of Mr. Lysne ¶¶ 3 and 4 supports that the examination was necessary.

[6]Plaintiff objects to the characterization of "waited". Therefore, the court omits that language.

[7]Plaintiff states that she had her medical certification prior to the start of the 2004 fire season, but fails to cite to any evidence to support this statement.

[8]Plaintiff claims that she was informed that she would be assigned to Prineville prior to the start of the 2004 fire season, but does not cite to any evidence.

REPORT AND RECOMMENDATION - 5

academic status during the school year and to provide a copy of her academic transcripts to the BLM after every academic term. (Casey Decl. ¶ 7, Ex. D).[9]

22. Ms. Dolan requested a position in the Oregon State Office of the BLM because it would be helpful in meeting the academic requirements of the SCEP program. (Cox. Decl. Ex. F at 3-4).

23. In the fall of 2005, Ms. Dolan told her supervisor that she had a lighter course load and asked whether she could work more than twenty hours a week. (Evers Decl. ¶ 3).

24. Ms. Dolan was not enrolled in college during the Fall of 2005. (Cox Decl. Ex. F at 4-5)[10].

25. At no time during her employment at the Oregon State Office in 2005 did Ms. Dolan inform the BLM that she was not enrolled in school. (Evers Decl. ¶ 4; Casey Decl. ¶ 9; Cox Decl. Ex. F at 4-5).

26. The BLM has never provided a Break In Program on a retroactive basis for a failure to meet SCEP requirements over the course of an entire academic year. (Casey Decl. ¶ 14).

---

[9]Plaintiff admits that this is what the contract says, but denies that they are requirements even though the contract contains these provisions under the section entitled "Requirements for Continuation in Program:".

[10]Plaintiff disputes that she was not enroled in school during the year 2005, but does not point to any evidence to support her contention. Exhibit F at 4 of the Cox declaration supports that plaintiff did not attend school the Fall semester of 2005. The court modifies this paragraph to reflect that fact.

REPORT AND RECOMMENDATION - 6

27. The BLM did not receive academic transcripts from Ms. Dolan for the 2004-2005 or 2005-2006 academic years. (Casey Decl. ¶ 15)[11].

28. On August 6, 2006, Mr. Colville, Chief of Human Resources at the BLM's Oregon State Office, made the decision to remove Ms. Dolan from the SCEP program because she failed to attend school during the entire 2005-2006 academic year, which was a condition of participation in the SCEP program. (Colville Decl. ¶ 6, Ex. C)[12].

29. Ms. Dolan was removed from the SCEP program 32 months after she filed an EEO complaint regarding Mr. Mathews' conduct. (Colville Decl. ¶ 6).

30. The BLM employee that made the decision to remove Ms. Dolan from the SCEP program had never met Mr. Matthews, and was not in his supervisory chain. (Colville Decl. ¶ 8).

31. The removal of Ms. Dolan from the SCEP program was consistent with actions that the BLM has taken toward other students that failed to meet the academic requirements of the SCEP program. (Casey Decl. ¶ 16).

Plaintiff submits the following additional facts in opposition to defendants' motion for summary judgment and in response to

_____

[11]Plaintiff objected to this paragraph contending she supplied academic transcripts for the year 2002. The court modified this paragraph to reflect the information in paragraph 15 of the Casey declaration.

[12]Plaintiff denies that she was removed from the program because she failed to attend school, but offers no evidence to support her denial. The Colville declaration paragraph 6 and Ex. C support that this was the reason Ms. Dolan was removed from the program.

defendants' concise statement of facts.

1. Ms. Dolan was a student employee of the BLM in the SCEP program. The SCEP program was designed to achieve a quality and diverse workforce within the BLM. (Creighton Decl. Ex. 1). The SCEP program provides opportunities to students to gain exposure to public service while enhancing their educational goals. (Id.). In addition, the SCEP employees may be noncompetitively converted to career appointments following the completion of their work experience and academic program. (Id.). It is the intent to offer successful SCEP employees permanent employment at the end of the program. (Hunter Depo. at 52). A requirement of the program is that the employee must "maintain at least half-time status as defined by the academic institution".[13] (Plaintiff's Ex. 2). Breaks in service are permitted, but must be approved. (Plaintiff's Ex. 2).

2. Mr. Mathews was assigned as her mentor, essentially by default. (Hunter Depo. at 15-16). He was the last person that was asked if he wanted to be a mentor. (Id.)[14].

Mr. Mathews and Ms. Dolan traveled to Arizona for training with other students across the country who were accepted into the SCEP program and their mentors. (Dolan Decl. ¶ 2). Mr. Mathews was

---

[13] The court modified this fact to reflect the contents of Plaintiff's Exhibit 2 and Casey Decl. Exhibits B and D.

[14] The court modified this sentence to reflect the contents of Hunter Depo. at 15-16.

REPORT AND RECOMMENDATION - 8

trained on how to be a mentor and given material on his duties as a mentor. (Mathews Depo. at 43-45, 58; Plaintiff's Ex. 5; Plaintiff's Ex. 6). They stayed for a week, both going to classes, doing trust building exercises and socializing together without incident. (Dolan Decl ¶ 2; Mathews Depo. at 47). As her mentor, Ms. Dolan had multiple contacts with Mr. Mathews. (Plaintiff's Ex. 11 at 128-130; Mathews Depo. at 47-48). They created a Student Mentor Action plan. (Mathews Depo. at 57-58; Plaintiff's Ex. 7).

Mr. Mathews gave Ms. Dolan advice about what classes she should be taking in the program and assisted her in getting into the classes. Ms. Dolan trusted Mr. Mathews completely and viewed him as a sort of a father figure. She felt that the BLM would not have put him in the position of mentor, if Mr. Mathews had not been trustworthy. She thought he would help her advance in her career with the BLM. (Dolan Dec. ¶ 4).

3. In the SCEP training, Ms. Dolan was informed that she would be issued a government credit card to be used for official government business only. (Dolan Decl ¶ 3). After making authorized charges, a BLM employee is responsible for paying for all billed items, prior to the due date. (Plaintiff's Ex. 3 at 12). An employee can be reimbursed for approved travel expenses by submitting travel vouchers within 5 days after the travel is complete, but reimbursement is usually between 2-4 weeks after the BLM business center receives the travel voucher request. (Plaintiff's Ex. 4).

REPORT AND RECOMMENDATION - 9

Ms. Dolan never used the government credit card for anything other than approved purposes. (Dolan Decl. ¶ 3).

4. In the summer of 2003, Ms. Dolan was stationed at Fort Rock, which is located in the Lakeview District, to fight fires. (Dolan Decl. ¶ 1). Fort Rock is approximately a 2 hour drive from Lakeview. (Plaintiff's Ex. 11 at 128; Crumrine Depo. at 26).

5. During the course of the summer of 2003, Dolan had spent the night in Lakeview on occasion. (Dolan Decl. ¶¶ 5-7). There was a small trailer in Lakeview where BLM employees would sometimes stay. (Brown Depo. at 12, 13).

Once when Dolan stayed in Lakeview, she was instructed to stay in the trailer, but told she would be charged for staying at the housing facility. However, Bob Crumrine, the Fire Control Officer intervened and she was able to stay without paying. (Plaintiff's Ex. 11 at 230; Dolan Decl. ¶ 6). Another time, she stayed with her engine boss. (Dolan Decl. ¶ 7).

At no time when she had occasion to be in Lakeview overnight for employment related reasons was she told to use a government credit card to pay for a hotel to stay overnight. (Id.). In fact at that time, she had never even heard of the government expending funds on hotel rooms for BLM employees who occasionally had to stay overnight in Lakeview.[15] BLM employees were always encouraged

---

[15] Defendants deny the previous two sentences, but do not cite to any evidence to support the denial. Plaintiff's affidavit supports the two sentences, and, therefore, they are included.

to stay with friends or find alternative, free housing when they had to travel to Lakeview. (Id.).

While fighting fires in the field, other BLM employees generally camped out. (Brown Depo. at 10-11). When other BLM employees needed to stay in motels, the BLM made the arrangements to stay. (Id. at 11). When there was other lodging available, the preferred option was to stay in other housing, rather an costing the taxpayers money. (Crumrine Depo. at 28). It was fairly common for BLM employees to stay with a friend when they needed to spend the night in Lakeview and did not have other lodging. (Hunter Depo. at 26). Some had stayed with Mr. Mathews from time to time. (Mathews Depo. at 36).

6. Mr. Brown observed Ms. Dolan on the job and thought she did "fine", had a good attitude, and was a team player. (Brown Depo. at 19). Mr. Crumrine, Ms. Dolan's new SCEP supervisor, thought Ms. Dolan's work performance was fine and satisfactory. (Crumrine Depo. at 20). Mr. Crumrine thought she cared about her job as a firefighter. (Id.).

Ms. Dolan was enjoying her job as the life long realization of her childhood dream. (Dolan Decl. ¶ 8). She took steps to ensure that she would be able to continue on in her fire-fighting related work and potentially enhance her career by inquiring of her supervisors about work in the Portland area during the school year. (Id.). Mr. Landsdowne told Ms. Dolan that he knew someone with

REPORT AND RECOMMENDATION - 11

the Fish and Wildlife Service in Salem, and that she might be able to work there. (Id.)[16].

7. On September 10, 2003, Ms. Dolan was in Lakeview to do her exit interview. (Id. at ¶10). She was supposed to meet with Robert Crumrine, but he was on leave and made arrangements for Mr. Mathews to take over. (Plaintiff's Ex. 11 at 235). Prior to her leaving Fort Rock, Mr. Landsdowne did not give her any instruction about accommodations once she got to Lakeview. (Dolan Decl. ¶ 10)[17].

Ms. Dolan met with Mr. Mathews and had her exit interview. (Plaintiff's Ex. 11 at 120-121). Afterwards, she worked at the Lakeview station for awhile.

At the end of the shift, Mr. Mathews asked her if she had a place to stay. Mr. Mathews offered to let her stay at his place. He never told her that she was authorized to use her government credit card to stay at a hotel that night. (Mathews Depo. at 68).

She thought nothing of accepting his invitation because she trusted him as her mentor. (Dolan Decl. ¶ 11). She would not have stayed with him had he not been her mentor. (Id.). Moreover, she had no indication Mr. Mathews was sexually interested in her. (Plaintiff's Ex. 11 at 130). Mr. Mathews admits that he did not believe that Ms. Dolan was coming on to him when she accepted his

---

[16] Defendants object that it was Mr. Landsdowne who knew someone at Fish and Wildlife, not Mr. Mathews. The court corrected the name.

[17] Defendants deny this sentence without citation to evidence. Therefore, the court includes this sentence.

REPORT AND RECOMMENDATION - 12

invitation.   (Mathews Depo. at 41).

8. When Ms. Dolan arrived, Mr. Mathews had been drinking, but Ms. Dolan had seen him drink in the past without incident and had no concern for her well being. (Plaintiff's Ex. 11 at 132-133). She became uncomfortable with the amount he was drinking when his speech started to slur.  (Id. at 134).  She was relieved when he went to bed.  (Id. at 135).  However, 10-15 minutes later Mr. Mathews returned wearing only a pair of boxer shorts whereupon he straddled her while she was sitting in a chair, rubbed his genitals against her, and was trying to kiss her. (Id. at 136-37).  Mr. Mathews held her in the chair for about 10 minutes before she pushed him off her.  (Id. at 136).

    She was appalled and shocked at his conduct. She thought he was trying to rape her.  (Dolan Decl. ¶ 12).

9. After extricating herself from Mr. Matthew's, she ran to the bathroom and locked herself inside.  (Id.).  Mr. Matthews was banging on the door and shouting at her to open the door.  (Id.). She became even more frightened that he was trying to rape her. (Id.)[18].  Mr. Matthews admits he sexually propositioned Ms. Dolan and that she refused his overture.  (Mathews Depo. at 185).

10. After Ms. Dolan fled the scene, she went to the home of a BLM employee, Vicki Baker, where a number of BLM employees were at a

---

[18] The court modified this paragraph to reflect the information contained in Dolan Decl. paragraph 12 and Plaintiff's Ex. 11 pages 136-139.

REPORT AND RECOMMENDATION - 13

party.  (Plaintiff's Ex. 11 at 26-27).  She disclosed what happened to Baker and Erika Coon, coworkers at the BLM.  (Id.).

11.  When Ms. Dolan was back in Portland, Mr. Mathews left approximately ten telephone messages for her, prior to September 15, 2003.  (Dolan Decl ¶ 13).  The messages indicated that he "heard something really bad happened" and he wanted to "work it out between the two of us."  (Id.).  Ms. Dolan took that to mean Mr. Mathews didn't want her to tell anyone what happened and he was trying to discourage her from complaining about it to his supervisors.  (Id.).  She felt threatened by his efforts to contact her and was afraid of him.  (Id.).  She was scared and nervous to report what Mr. Mathews had done to her.  (Id.).

Mr. Crumrine, Ms. Dolan's supervisor gave Mr. Mathews Ms. Dolan's telephone number after Mr. Crumrine talked with Mr. Mathews about what Mr. Mathews thought occurred on September 10, 2003. (Crumrine Depo. at 53-55).  Ms. Dolan did not return his calls or have further contact with Mr. Mathews.  (Plaintiff's Ex. 11 at 122; Dolan Decl. ¶ 13).

When Mr. Mathews's spoke with his supervisor Mr. McElwain about what Mr. Mathews thought happened, Mr. McElwain told Mr. Mathews to try and contact Ms. Dolan one more time and that if she did not want to speak with Mr. Mathews to have her call him.

(Mathews Depo. at 89-90).[19]

At that point, no one from the BLM prohibited Mr. Mathews from contacting Ms. Dolan, despite believing that contact from Mathews emotionally upset Ms. Dolan.  (Id.; Crumrine Depo. at 55).

12. Ms. Dolan first reported what happened to her supervisor, Mr. Landsdowne, on September 15, 16, or 17.  (Plaintiff's Ex. 11 at 144).  Mr. Landsdowne had heard a rumor about the incident on September 14, but did not hear about what happened from Ms. Dolan until September 17.  (Plaintiff's Ex. 11 at 277).

13. During the exit interview, Mr. Mathews offered to call the Portland BLM office to see if there was work there for Ms. Dolan during the winter.  (Mathews Depo. at 58-59).  Mr. Mathews asked Mr. McElwain to follow-up, because of the incident on September 10.  (Id. at 59).  Ms. Dolan in her declaration states that Mr. Landsdowne did not follow-up with her about an opportunity to work at Fish and Wildlife.  (Dolan Decl. ¶ 8).[20]

14. Ms. Dolan was extremely upset after the incident with Mr. Mathews.  (Dolan Decl. ¶ 16). She lost sleep, had nightmares, had flashbacks and panic attacks.  (Id.).  She was extremely stressed and disappointed about Mr. Mathews's actions.  (Crumrine Depo. at 58).  She lost faith in the system and was "blown away" by what

---

[19] The court modified this sentence to reflect the content of the Mathews deposition at page 90.

[20] The court omitted the sentences from this paragraph which were not supported by any evidence.

happened.    (Crumrine Depo. at 68-69).    Mr. Crumrine believed that she might not want to be in the environment where she had so much emotional distress.    (Crumrine Depo. at 59).    Mr. Hunter acknowledged that having both Dolan and Mathews working in the same location would be "uncomfortable." (Hunter Depo. at 30).    Although Ms. Dolan did not wish to leave Lakeview, where she had formed relationships with coworkers and gained recognition for her skills and devotion to her career, she requested a transfer, because she felt she had to in order to avoid contact with Mr. Mathews, which immensely affected her emotional state.    (Dolan Decl. ¶ 15).    No one from the BLM ever indicated to Ms. Dolan that Mr. Mathews would be transferred, or he would have no contact with her, if she returned to Lakeview.    (Id.).

15. It was common knowledge that Mathews was dating an employee of the BLM Lakeview office.    (Crumrine Depo. at 33-34; Brown Depo. at 23; Hunter Depo. at 38).[21]    He had dated at least 2 other women he worked with for the BLM in Vale, one of which he supervised. (Mathews Depo. at 13-14, 16).    There was no policy in place about employees dating each other.    (Crumrine Depo. at 34-36).[22]    The BLM imposed discipline on Mr. Mathews three months after the incident

---

[21] Defendants object to sentences 1-2, 5, 7-8 of this paragraph as hearsay.    The court excludes the sentences as they are based upon hearsay or are not based upon personal knowledge.

[22] Defendants object to the last part of sentence 6 regarding the potential for unwanted advances in the workplace.    The last part of this sentence is not supported by the cited evidence, and, therefore, the court excludes it.

REPORT AND RECOMMENDATION - 16

with Ms. Dolan.   (McElwain Decl. Ex. A).[23]

16. The discipline eventually imposed against Mathews was a five day suspension and the BLM has a "zero tolerance" policy for sexual harassment.  (Plaintiff's Ex. 11 at 376-378; Casey Decl. Ex. C at 6).[24]  Mr. Mathews understood that he was being disciplined for "inappropriate conduct of a sexual nature" with a BLM employee. (Mathews Depo. at 79).

17. EEO regulations prevented the BLM from informing employees who knew about Mathews's conduct about the disciplinary action or that any other remedial or preventative measures took place as a result of the investigation.  (Crumrine Depo. at 60-61).[25]  While Mr. Hunter, a fire operations supervisor, was in Lakeview, at the time of the incident between Mr. Mathews and Ms. Dolan, he did not hand out any materials on sexual harassment and he did not know where the written sexual harassment was located in the Lakeview office. (Hunter Depo. at 49-50).  During the summer of 2003, the BLM had posted sexual harassment prevention materials and the BLM policy in the Lakeview break room.  (Cox Decl. Ex. D at 3-4).

_____

[23] The court modified this sentence to reflect the factual content of Ex. A.

[24] Defendants objected to the characterization of the discipline as "surprisingly insignificant".  The court modified this sentence to reflect the factual contents of the cited evidence.

[25] Defendants admit that EEO regulations prohibited them from informing other employees regarding the disciplinary action taken against Mr. Mathews.  The court modifies this sentence accordingly.

REPORT AND RECOMMENDATION - 17

Prior to September 2003, Mr. Mathews attended an SCEP training program from June 16-20, 2003, which included a one hour block of instruction on "Diversity and Prevention of Sexual Harassment". At the same time, he also received the BLM's policy of "Zero Tolerance of Sexual Harassment" and other EEO materials. (Casey Decl. ¶6 and Ex. C). Mr. Mathews also took a 16 hour EEO class. (Mathews Depo. at 74-75). Although sexual harassment was discussed in orientation on a yearly basis, Mr. Mathews was not required to attend these yearly sessions. (Id.).[26]

18. Almost 3 years after Ms. Dolan was attacked, Mr. Mathews still had supervisory authority over employees. (Crumrine Depo. at 6-7).

19. Ms. Dolan indicated during the initial investigation that she was unwilling to have Mr. Mathews continue as her mentor. (Plaintiff's Ex. 11 at 48). No one talked with Mr. Mathews about transferring him from Lakeview in connection with his discipline. (Mathews Depo. at 92)[27].

Prior to the start of the 2003 fire season, Ms. Dolan had a physical. (Dolan Decl. ¶ 17). She was originally assigned to the Lakeview district prior to getting that physical. (Id.). Ms. Dolan served in Lakeview as an SCEP student prior to having her baseline physical. (Id.).

---

[26] Defendants object to sentences 2-4, and the court modifies these sentences to reflect the evidence.

[27] The second sentence was modified to reflect the contents of the admissible evidence cited and the sentences without citation to evidence were omitted.

REPORT AND RECOMMENDATION - 18

The 2003 fire season was particularly busy. (Id.). The clinic that BLM recommended for Ms. Dolan to get her medical exam was approximately a 3 hour drive from the Fort Rock guard station where Ms. Dolan was stationed. (Id.). Ms. Dolan did not have the opportunity to take off of work and drive six hours to obtain a medical exam during the busy fire season. (Id.).

After September 10, 2003, a significant portion of Ms. Dolan's time was spent dealing with the after effects of Mr. Mathews's conduct. (Id.). She went to the doctor in November of 2003 to obtain her medical certification. (Id.). Due to an inconclusive lung capacity test, she was required to do further testing. (Id.). Her ability to get further testing was exacerbated by her school schedule and work hours. (Id.). She went to the doctor in April of 2004 and was told that she passed all her tests. (Id.).

Ms. Dolan had her certification well in advance of the beginning of the 2004 fire season, which started in June. (Id.). Even after she received her certification, she was not placed in a new position for several weeks. (Id.). By the time she had been placed, half of the fire season was already over. (Id.).

20. Ms. Dolan was placed in the Prineville district on August 18, 2004. (Dolan Decl. ¶ 18). She was placed in the position of Ranger tech (Senior Firefighter GS-4). (Casey Decl. Ex. D at 1). She was assigned Geoff Babb, Louisa Evers, Guy Chamness, and Mike Benefield as mentors. (Id.). Ms. Dolan was not informed that she

REPORT AND RECOMMENDATION - 19

was assigned any mentors.  (Dolan Decl. ¶ 18).

Ms. Dolan was told that Mike Benefield was her contact person, but he never met with her to discuss her career goals, educational opportunities or job performance.  (Id.).  The SCEP mentor information suggests that a mentor meet with his/her mentee once a week to provide feedback.  (Plaintiff's Ex. 5).  Ms. Dolan saw no indication and received no information that Mr. Benefield had ever gone through the SCEP mentorship training program.  (Dolan Decl. ¶ 18).

21. In July of 2004, the BLM placed Ms. Dolan at the Paulina guard station in the Prineville district, where one of her supervisors engaged in repeated acts of sexually inappropriate and violent conduct, including, but not limited to chasing female BLM employees around the engines, handcuffing an employee to an engine, using crude and vulgar language, "dry humping" a male BLM employee while exclaiming "I'll show you how a real man does it!", throwing objects around the station in anger, and telling Ms. Dolan that he would drown her in the reservoir. (Dolan Decl. ¶ 19).

Mr. Crumrine talked with Mr. Chamnes regarding problems that another female BLM employee, Ms. Holloway, had with Mr. Gruber at the Paulina guard station.  (Crumrine Depo. at 62).  Mr. Crumrine had arranged to have Ms. Holloway transferred back to Lakeview, but he could not ask for Ms. Dolan's transfer since he no longer supervised her.  (Id.).  Mr. Chamnes knew there were some problems

he was having with Mr. Vaugh.  (Id. at 68).[28]

22.  Ms. Dolan was terminated from the SCEP program in August of 2006.  Prior to being terminated from the SCEP program, the BLM requested transcripts from her.  (Supp. Cox Decl. Ex. A at 54-55).[29] She had given the BLM a transcript for the 2002 academic year when it was requested it.  (Dolan Decl. ¶ 22).

Prior to being terminated, Ms. Dolan requested that she be granted a "break in service" due to the extenuating circumstances surrounding her service.  (Casey Decl. Ex. F).  Dolan's request was denied.  (Dolan Decl. ¶ 21).  No one at the BLM ever requested further details of the "extenuating circumstances" at issue necessitating Dolan's break in service.  (Id.).  Ms. Dolan had spoken to the EEO and Sheila Casey, the SCEP coordinator, about Mr. Mathews' conduct on September 10, 2003 and also spoke with the EEO investigator regarding Von Gruber's conduct in the summer of 2005. (Id.).[30]

Since September 10, 2003, Ms. Dolan has had severe difficulties completing her academic requirements due to her emotional condition caused by Mr. Mathews's conduct.  (Dolan Decl.

---

[28] Defendants object to sentence two of this paragraph.  The court modifies this sentence to reflect the evidence in the record.

[29] Ms. Dolan's declaration contradicts her prior deposition testimony.  The court excludes the statements in the declaration which are contradicted by the deposition testimony and includes the deposition testimony.

[30] The court modifies this paragraph to reflect the contents of Dolan Decl. ¶ 21).

¶ 16).   Ms. Dolan is two classes short of completing her degree. (Supp. Cox Decl. Ex. A at 2).   Ms. Dolan needs a passing grade in Algebra to complete one of her required courses, and despite taking Algebra several times she has only received a D each time. (Id. at 14-15, 17)[31].

23. There is a general range of when an employee stops working at the end of the fire season. This range is from August until sometime in mid October.  (Crumrine Depo. at 49).   Ms. Dolan had always picked her own date for ending her employment for the summer.  (Dolan Decl. ¶ 23).   In mid September 2006, around the time she would be ending her seasonal employment for the year, her friend's father died. (Id.).   She notified her supervisor that she would need time off for the funeral.  (Id.).   She subsequently notified him that she was having difficulties coping with this death and wished to end her seasonal employment for the year. (Id.).   She returned her equipment and gear to the Portland BLM office. (Id.).   Ms. Dolan decided not to return to the BLM for the 2007 fire season because she was disheartened and disgusted with the way she was treated by the BLM and cast aside once she made her complaint.  (Id.)[32].

---

[31] Ms. Dolan's declaration does not contradict her previous testimony.   The court added this information to reflect the contents of Supp. Cox Decl. Ex. A.

[32] Defendants object to paragraph 24.   The court excludes this paragraph as it is based upon Ms. Dolan's subjective beliefs.

24.   Plaintiff claims that Mr. Mathews conduct changed her work environment in the following ways:

1) plaintiff requested a transfer from Lakeview[33];

4) plaintiff was fearful of seeing Mr. Mathews on site at a fire; and

6) plaintiff distrusted the BLM and their response to sexual harassment issues.

## II. <u>LEGAL STANDARDS</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir.), <u>cert. denied</u>, 502 U.S. 994 (1991). In

---

[33] Plaintiff alleges in her declaration that she was forced to leave Lakeview. However, the evidence in the record shows that she requested a transfer from Lakeview. There is no evidence in the record regarding the timing of her request. The court has considered plaintiff's third reason and there is no evidence that plaintiff was ever in Lakeview after the incident and the evidence shows that plaintiff did not see Mr. Mathews after the incident. The court considered reason five and finds this is not an alteration of her conditions of employment, but is only testimony regarding the impact Mr. Mathews actions had on her. The court has considered plaintiff's second, seventh, eighth, and ninth reasons. These statements are based on plaintiff's subjective beliefs that are not supported by personal knowledge, are contradicted by the evidence in the record, and/or are based upon speculation. <u>See</u> <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1028 (9th Cir. 2001)(plaintiff's subjective belief, without evidence supporting that belief, that a defendant acted with an unlawful motive insufficient to create a genuine issue of material fact).

REPORT AND RECOMMENDATION - 23

deciding a motion for summary judgment, the court must determine, based on the evidence of record, whether there is any material dispute of fact that requires a trial. <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994)(citations omitted). The parties bear the burden of identifying the evidence that will facilitate the court's assessment. <u>Id</u>.

The moving party bears the initial burden of proof. <u>See</u> <u>Rebel Oil Co., Inc. v. Atlantic Richfield Co.</u>, 51 F.3d 1421, 1435 (9th Cir.), <u>cert. denied</u>, 516 U.S. 987 (1995). The moving party meets this burden by identifying portions of the record on file which demonstrates the absence of any genuine issue of material fact. <u>Id</u>. "[T]he moving party . . . need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." <u>Cray Communications, Inc. v. Novatel Computer Systems, Inc.</u>, 33 F.3d 390, 393 (4th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1191 (1995)(citation omitted); <u>See</u> <u>City of Mt. Pleasant, Iowa v. Associated Electric Co-op, Inc.</u>, 838 F.2d 268, 273-274 (8th Cir. 1988)(it is sufficient for the movant to argue that the record does not contain an issue of fact and to identify that part of the record that supports that assertion).

In assessing whether a party has met their burden, the court must view the evidence in the light most favorable to the nonmoving party. <u>Allen v. City of Los Angeles</u>, 66 F.3d 1052 (9th Cir. 1995). All reasonable inferences are drawn in favor of the nonmovant. <u>Id</u>.

If the moving party meets their burden, the burden shifts to the opposing party to present specific facts which show there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816 (9th Cir. 1995), cert. denied, 517 U.S. 1167 (1996). The nonmoving party cannot carry their burden by relying solely on the facts alleged in their pleadings. Leonard v. Clark, 12 F.3d 885, 888 (9th Cir. 1994). Instead, their response, by affidavits or as otherwise provided in Rule 56, must designate specific facts showing there is a genuine issue for trial. Id.

### III. **DISCUSSION**

Defendants move for summary judgment arguing that:

1) Mr. Mathews was not acting within the course and scope of his employment when he allegedly committed the tort of invasion of privacy, and, therefore the court does not have jurisdiction over the United States;

2) even if Mr. Mathews was acting within the course and scope of his employment, the court lacks subject matter jurisdiction as the United States is not liable for "any claim arising out of assault, battery, false imprisonment, false arrest" under 28 U.S.C. § 2680(h): plaintiff's invasion of privacy claim is premised solely upon her assertion that Mr. Mathews committed an intentional assault upon her; plaintiff fails to identify any negligent act that Mr. Mathews allegedly committed; and plaintiff cannot circumvent the Federal Tort Claims Act's intentional tort exception

REPORT AND RECOMMENDATION - 25

through artful pleading;

3) there is no evidence that the BLM was negligent in its supervision of Mr. Mathews;

4) the single incident did not alter the terms of plaintiff's employment or create a hostile work environment;

5) the BLM's effective response to the incident precludes liability;

6) no tangible employment action was taken against plaintiff;

7) the BLM exercised reasonable care to prevent the incident and to promptly correct the behavior;

8) plaintiff fails to establish a prima facie case of retaliation, because there is no causal connection between the adverse employment action and her EEO complaint; and

9) the BLM had a legitimate non-discriminatory reason for terminating plaintiff from the SCEP program.

In response, plaintiff argues that:

1) the BLM is liable for plaintiff's invasion of privacy claim which is separate and distinct from any assault claim, citing Helton v. U.S., 191 F.Supp.2d 179 (D.C. 2002), the mere fact that Mr. Mathews actions constitute the tort of assault does not preclude plaintiff's claim for invasion of privacy, and although the harm caused and the damages are similar this does not convert plaintiff's invasion of privacy claim into an assault claim;

2) material issues of fact exist regarding whether the BLM was negligent with regard to the supervision of Mr. Mathews - the BLM had notice that Mr. Mathews was sexually opportunistic; it was common knowledge Mr. Mathews dated other BLM employees; there were no preventative measures proscribing dating among employees; the BLM failed to investigate prior incidents of harassing behavior by Mr. Mathews; the BLM did not determine if Mr. Mathews would be an appropriate mentor for Ms. Dolan; it was foreseeable that the BLM's failure to investigate and failure to properly consider whether Mr. Mathews was an appropriate mentor would lead to the harm caused;

3) Ms. Dolan suffered tangible employment actions in that she suffered sexual harassment by her supervisor, she was transferred to another district, her placement was delayed by two months, her new duties were less prestigious and less desirable, the BLM did not follow-up on the promise to find her a position at Fish and Wildlife;

4) plaintiff was subject to a hostile work environment and the fact that her supervisor was responsible for the harassment creates a per se hostile work environment - plaintiff's case is similar to Little v. Windemere, 301 F.3d 958 (9th Cir. 2001) - the sexual assault effected plaintiff's employment by forcing her to leave Lakeview, losing two months salary while awaiting a transfer, making her feel unsafe around Mr. Mathews and in Lakeview, making her fearful of seeing Mr. Mathews on the job, impeding her

completion of her education and the SCEP program, making her distrustful of the BLM and their response to sexual harassment, and contributing to her termination from the SCEP program;

5) judicial estoppel prevents defendants from asserting the Faragher/ Ellerth affirmative defense;

6) the Faragher/Ellerth defense fails as the BLM's anti-harassment policy was inadequate and the BLM did not act promptly to correct the behavior;

7) genuine issues of material fact exist regarding plaintiff's retaliation claim - plaintiff suffered adverse employment actions in the form of transfer to another district, two month delay in placement, being place in another hostile work environment, and termination from the SCEP program;

8) the record supports a reasonable finding of a causal connection between plaintiff's protected activity and the adverse actions - temporal proximity supports the causal connection and awareness by the person who took the adverse action supports causation;

9) the record supports a reasonable inference that the BLM's proffered reasons for plaintiff's termination were pretextual - plaintiff was forced to transfer, her transfer was delayed, she was not assigned fire fighting duties, she was not assigned another mentor, she was assigned to a station where the supervisor was known to be engaging in sexual harassment, plaintiff was not requested to provide transcripts prior to 2006, and the BLM denied

her request for a break in service.

In reply, defendants argue that:

1) plaintiff's invasion fo privacy claim is barred, because Mr. Mathews assault is essential to the claim, citing <u>Thomas-Lazear v. F.B.I.</u>, 851 F.2d 1202, 1206 (9th Cir. 1988) and <u>Metz v. U.S.</u>, 788 F.2d 1528, 1534 (11th Cir. 1986), <u>cert. denied</u>, 479 U.S. 930 (1986) and arguing that <u>Black</u> is not applicable to this case;

2) there is no admissible evidence that the BLM was on notice that Mr. Mathews might behave inappropriately toward plaintiff;

3) the single incident of sexual harassment did not create a hostile work environment;

4) defendants did not waive the Faragher/Ellerth defense;

5) the transfer that occurred months after plaintiff's EEO complaint was not a tangible employment action;

6) the BLM's response to plaintiff's complaint was effective;

7) plaintiff fails to establish a prima facie case of retaliation or demonstrate that the defendants' non-discriminatory reason for removing her from the SCEP program was pretextual.

**Course and Scope of Employment**

"The FTCA, 28 U.S.C. § 1346(b), provides a cause of action against the federal government for 'persons injured by the tortious activity of an employee of the United States, where the employee was acting within the scope of his office or employment' . . .." <u>Wilson v. Drake</u>, 87 F.3d 1073, 1076 (9th Cir. 1996), <u>cert. denied</u>,

REPORT AND RECOMMENDATION - 29

520 U.S. 1142 (1997)(citing <u>Meridian Int'l Logistics v. United States</u>, 939 F.2d 740, 742 (9th Cir. 1991)).  To determine whether an employee acted within the course and scope of his employment, the court looks to the principles of respondeat superior in the state in which the alleged tort occurred.  <u>Id.</u> (citing <u>Pelletier v. Federal Home Loan Bank</u>, 968 F.2d 865, 876 (9th Cir. 1992)).  In this case Oregon law applies.

Under Oregon Law,

> To establish that the employee acted within the course and scope of employment requires proof of three things: (1) the tortious act must have occurred substantially within the time and space limits authorized by the employment; (2) the employee must have been motivated, at least partially, by a purpose to serve the employer; and (3) the employee's act is of a kind which the employee was hired to perform.

<u>Vinsonhaler v. Quantum Residential Corp.</u>, 189 Or.App. 1, 5 (2003)(citing <u>Chesterman v. Barmon</u>, 305 Or. 439, 442 (1988)).  If the plaintiff fails to establish at least a jury question as to any element of her claim, the defendants are entitled to summary judgment.  <u>See</u> <u>Vinsonhaler</u>, 189 Or.App. at 6 (defendant was entitled to summary judgment because plaintiff failed to present any evidence from which a reasonable jury could infer that the employee engaged in conduct of any sort which was intended to serve his employer).

"[T]he relevant act for respondeat superior analysis is the act that was the immediate cause of harm."  <u>Minnis v. Oregon Mutual Insurance Co.</u>, 334 Or. 191, 202 (2002)(citing <u>Stroud v. Denny's</u>

Restaurant, 271 Or. 430, 437 (1975)).  Liability may be imposed if acts within the course and scope of employment resulted in acts which led to the injury.  Id. (citation omitted).  However, where there is no causal connection between the work place conduct and the alleged off the job injury, liability will not be imposed.  Id.

The undisputed facts demonstrate that the conduct which plaintiff alleges caused her injury was the sexual assault at Mr. Mathews' residence after work hours.  Plaintiff does not contend or present any evidence of other previous work-place harassment and does not contend that any other previous work-place harassment caused the sexual assault.

The undisputed evidence demonstrates that the sexually abusive conduct did not occur substantially within the time and space limits authorized by Mr. Mathews' employment.  Therefore, Mr. Mathews was not acting within the course and scope of his employment and the BLM is not vicariously liable for the actions of Mr. Mathews at his residence after work hours.  See Minnis, 334 Or. at 203 (employer not vicariously liable for supervisor's sexual assault on employee which occurred at supervisor's apartment after work hours).

The court finds that defendants are entitled to summary judgment of plaintiff's claim for invasion of privacy.  As an alternative basis for this holding, the court will address defendants' argument regarding the FTCA's exclusion for intentional

torts.

**FTCA Intentional Torts Exclusion - Invasion of Privacy**

28 U.S.C. § 2680(h) of the FTCA expressly bars causes of action for "any act arising out of assault, battery, false imprisonment, and false arrest". Wilson, 87 F.3d at 1076 (citing 28 U.S.C. § 2680(h)). This section of the FTCA "bars claims arising out of either negligent or intentional commission of the enumerated torts" and the court will look "beyond the labels used to determine whether a proposed claim is barred." Thomas-Lazear, 851 F.2d at 1206-1207(citations omitted).

In determining whether a claim based upon particular conduct is barred by one of the enumerated exemptions established in § 2680(h), the court looks at whether the conduct upon which the claim is based falls within the definition of a tort enumerated in § 2680(h) as that tort was traditionally or commonly understood when the FTCA was enacted. Sheehan v. U.S., 896 F.2d 1168, 1170, opinion amended, 917 F.2d 424 (9th Cir. 1990).

Sexual assault is defined as: "Offensive sexual contact with another person". Black's Law Dictionary 123 (Bryan A. Garner ed. 2004). Simple assault is defined as

> A person is guilty of assault if he: (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another ; or (b) negligently cause bodily injury to another with a deadly weapon; or c) attempts by physical menace to put another in fear of imminent serious bodily injury.

(Id.). Battery is defined as: "The use of force against another,

REPORT AND RECOMMENDATION - 32

resulting in harmful or offensive contact." Id. at 162. It is also defined as: "An intentional and offensive touching of another without lawful justification." Id. Invasion of privacy by intrusion is defined as: "An offensive, intentional interference with a person's seclusion or private affairs." Id. at 843.

The undisputed facts demonstrate that plaintiff's invasion of privacy claim is based upon the events that occurred at Mr. Mathews' residence on the night of September 10, 2003. The acts included Mr. Mathews physically assaulting plaintiff by trying to kiss her, straddling her, and rubbing up against her while in his boxer shorts. In addition, Mr. Mathews sexually propositioned her and banged on the bathroom door causing plaintiff to fear that Mr. Mathews was trying to rape her.

It is clear that plaintiff's invasion of privacy claim is based upon conduct that falls within the definition of assault and battery and is not based upon conduct independent of the assault and battery, and is therefore barred by § 2680(h). See Metz v. U.S., 788 F.2d 1528, 1532-1535 11th Cir. 1986)(claim invasion of privacy which arose out of false arrest barred by FTCA intentional tort exception). Therefore, defendants are entitled to summary judgment on plaintiff's claim for invasion of privacy.

**Negligent Supervision**

Under Oregon law,

the common law rule regarding providing a safe work place by controlling the conduct of others contemplates that

REPORT AND RECOMMENDATION - 33

> the putative tortfeasor has the opportunity to prevent
> the risk of harm that results in the injury. Although it
> is not necessary that the person be able to foresee the
> exact harm that occurs, the duty to prevent harm or to
> warn of it does not arise until there is something that
> would put a reasonable person on notice that a
> generalized risk of harm exists and that there is an
> opportunity to prevent the risk.

Friedrich v. Adesman, 146 Or.App. 624, 628-629 (1997)(citation

omitted). Employers are liable for negligently hiring or retaining

employees if the employer negligently places "an employee with

known dangerous propensities, or dangerous propensities which could

have been discovered by a reasonable investigation, in a position

where it is foreseeable that he could injure the plaintiff in the

course of the work. Chesterman v. Barmon, 82 Or.App. 1, 4 (1986),

review allowed, 302 Or. 64 (1987), opinion affirmed and remanded,

305 Or. 439 (1988).

Plaintiff has failed to present any admissible evidence that

the BLM knew or should have known or had any reason to investigate

Mr. Mathews regarding tendencies to sexually harass or assault

female employees. There is no evidence of any prior complaints

against Mr. Mathews for sexual harassment. There is no admissible

evidence that the BLM had any reason to investigate Mr. Mathews.

Therefore, defendants are entitled to summary judgment on

plaintiff's negligent supervision claim. See Carr v. U.S. West

Direct Co., 98 Or.App. 30, 37, review denied, 308 Or. 608 (1989)

(court found summary judgment was proper when as a matter of law

plaintiff's evidence was insufficient to show defendant's conduct

REPORT AND RECOMMENDATION - 34

fell below that standard of care).

**Title VII Hostile Work Environment Claim**

Title VII of the Civil Rights Act makes it illegal for an employer to discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because of an employee's sex.  42 U.S.C. §§ 2000e(a)(1), 2000e-2(a), 2000e-5.  A plaintiff may show a violation of Title VII by proving disparate treatment, disparate impact, or the existence of a hostile work environment.  Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109 (9th Cir. 1991).  Plaintiff alleges a claim for hostile work environment.

The phrase "terms, conditions, or privileges of employment" include requiring an employee to work in a discriminatory hostile work environment.  Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986).  A hostile work environment exists when the work place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the condition of the victim's employment and create an abusive working environment.  Faragher v. Boca Raton, 524 U.S. 775, 786 (1998); Meritor Savings Bank, 477 U.S. at 65-67.  The conduct must be severe or pervasive enough to alter the conditions of the victim's employment and create an objectively hostile or abusive work environment; an environment a reasonable person in the plaintiff's position would find hostile or abusive considering all the

circumstances.  <u>Faragher</u>, 524 U.S. at 787; <u>Oncale v. Sundowner
Offshore Services, Inc.</u>, 523 U.S. 75, 81 (1998); <u>Harris v. Forklift
Systems, Inc.</u>, 510 U.S. 17, 21-22 (1993); <u>Ellison v. Brady</u>, 924
F.2d 872, 879 (9th Cir. 1991); <u>Steiner v. Showboat Operating
Company</u>, 25 F.3d 1459, 1462, <u>cert. denied</u>, 513 U.S. 1082 (1995).
The assessment of whether an environment is objectively hostile
"requires careful consideration of the social context in which the
particular behavior occurs and is experienced by its target."
<u>Oncale</u>, 523 U.S. at 81.

In addition, the victim must perceive the environment as
hostile; the conduct must actually alter the conditions of the
victim's employment.  <u>Harris</u>, 510 U.S. at 21-22.  The conduct does
not have to seriously effect the victim's psychological well being.
<u>Id</u>.  So long as the environment would reasonably be perceived, and
is perceived, as hostile or abusive, there is no need for
psychological injury.  <u>Id</u>.; <u>Fuller v. City of Oakland, California</u>,
47 F.3d 1522, 1526 (9th Cir. 1995) (citation omitted).  It is
enough that the hostile conduct pollutes the workplace, making it
more difficult for the victim to do her job, take pride in her
work, and to desire to stay in her position.  <u>Steiner</u>, 25 F.3d at
1462.

Whether an environment is hostile or abusive depends on all
the circumstances including; the frequency of the discriminatory
conduct; it's severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001); Harris, 510 U.S. at 23. No single factor is required. Steiner, 25 F.3d at 1462. The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness of frequency of the conduct. Ellison, 942 F.2d at 878. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not qualify as changes in the terms and conditions of employment. Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 788.

In order to prevail on her claim, the plaintiff must prove: 1) that she suffered discrimination because of her sex by the intentional conduct of other employees consisting of verbal or physical harassment, ridicule, or sexually derogatory language; 2) that the conduct was unwelcome; 3) that the conduct was severe or pervasive enough to alter the conditions of her employment, considering all the circumstances; 4) that the discrimination detrimentally affected her; 5) that the conduct would detrimentally affect a reasonable woman in the plaintiff's position; 6) that management level employees knew or should have known about the alleged sexual harassment; 7) that management level employees failed to investigate the alleged harassment or adequately discipline the harasser. Ward v. Cheltenham Township, 1991 WL 63833 (E.D.Pa.).

REPORT AND RECOMMENDATION - 37

Defendants argue that, as in <u>Brooks</u>, plaintiff fails to present sufficient evidence to establish the objective component of her hostile work environment claim.  In response, plaintiff argues that her case is similar to <u>Little</u> and <u>Craig v. M & O Agencies, Inc.</u>, __ F.3d __, 2007 WL 2264635 (9th Cir.) and that her evidence is sufficient to establish a hostile work environment.

In <u>Brooks</u>, the court found that the plaintiff failed to produce sufficient evidence to establish the objective component of a hostile work environment claim.  <u>Brooks</u>, 229 F.3d at 926-927.  In <u>Brooks</u>, in a single day a co-worker touched plaintiff's stomach and made comments about its softness at the workplace, trapped plaintiff against a communications console, forcing his hand up her shirt and fondling her breasts, and later approaching her again as if he would fondle her.  The court acknowledged that the conduct by plaintiff's co-worker was egregious, but found that plaintiff failed to prove that she reasonably feared she would be subject to misconduct in the future because her employer encouraged or tolerated the harassment.  <u>Id</u>. at 924-927.  The court pointed out that this was a single incident and the employer's reaction was to remove the harasser from the workplace once his conduct was discovered.  <u>Id</u>. at 924.

The court stated that it did not have to decide whether a single incident of sexual harassment could ever suffice to support a hostile work environment claim, but noted that such an incident

would have to be "extremely severe".  Id. at 925-926.  Instead, the
court focused on the factors of "frequency., severity, and
intensity of interference with working conditions"  and found that
"a reasonable woman in Brooks's position" could not consider the
terms and conditions of her employment altered by the co-worker's
actions.  Id. at 926.  The court found that "Brooks was harassed on
a single occasion for a matter on minutes in a way that did not
impair her ability to do her job in the long-term, especially given
that the city took prompt steps to remove Selvaggio from the
workplace."  Id.  The court went on to compare Selvaggio's conduct
to other cases in which court's found that the harassment was not
severe enough to support a hostile work environment claim.  Id. at
926-927 (citations omitted).

    The court stated that its holding did not condone Selvaggio's
actions, but demonstrated that "not all work-place conduct that may
be described as harassment affects a term, condition, or privilege
of employment within the meaning of Title VII."  Id. at 927
(quotations and citation omitted).  The court found that

        The harassment here was an entirely isolated incident.
        It had no precursors, and it was never repeated.  In no
        sense can it be said that the city imposed upon Brooks
        the onerous terms of employment for which Title VII
        offers a remedy.

Id.

    In Little, the plaintiff was a former employee who was
allegedly raped by the employer's client after a business dinner

REPORT AND RECOMMENDATION - 39

with the client.  <u>Little</u>, 301 F.3d at 964.  She was reluctant to tell anyone at her place of employment about the incident, because of the client's importance.  <u>Id</u>.  A few days after the rape, she reported the rape to the Director of relocation Services, who advised her not to tell anyone in management.  <u>Id</u>. at 964-965.

Nine days after the rape, she reported it to the Vice President of Operations who was designated as a complaint-receiving manager under the company's sexual harassment policy.  <u>Id</u>.  The manager's reaction was to give her a hug and state that she wished there was something she could do and asked plaintiff if she was attending therapy.  <u>Id</u>. at 965.  The manager told plaintiff that she would not report the incident to the president of the company unless the plaintiff was taking legal action against her alleged rapist.  <u>Id</u>.  The manager also told plaintiff that it would be best if she tried to put the incident behind her, keep going to therapy, and discontinue working on the account.  <u>Id</u>.  The manager did not advise plaintiff to go to the police, conduct an investigation or do a follow-up interview with plaintiff.  <u>Id</u>.  The manager testified that because the rape occurred outside the working environment, she believed it fell outside the scope of the company's sexual harassment policy.  <u>Id</u>.

The president of the company continued to ask plaintiff about the status of the account, and the plaintiff then told her immediate supervisor about the rape.  <u>Id</u>.  Her immediate supervisor

advised plaintiff to tell the company's president about the rape. Id.

When plaintiff told the president about the rape, his immediate response was that he didn't want to hear about it, and that she would have to respond to his attorneys. Id. The president then proceeded to restructure her salary from $3000 a month to $2000 a month plus $250 per closed transaction. Id. The salary reduction was effective immediately. Id.

Plaintiff found the pay cut unacceptable, and the president told her to go home for two days to think it over. Id. When she returned two days later and still found the pay cut unacceptable, the president told her it would be best if she moved and she should clean out her desk. Id. Plaintiff alleged that her employer's response to the rape created a hostile work environment. Id. at 966.

The court found that the rape by her employer's client was severe and would have made a reasonable woman feel her work environment had been altered, and that the work environment extended beyond the office as having out-of-office meeting with potential clients was a required part of the job. Id. at 967. The court also found that her employer's subsequent actions reinforced, rather than remedied the harassment by requiring her to continue responsibility for the account, informing her that reporting the rape would probably result in adverse employment action, and

cutting her salary when she did report the rape to the president. Id. The court found that the employer's failure to take immediate and effective corrective action allowed the effects of the rape to permeate plaintiff's work environment and alter it irrevocably. Id. Based upon this, the court found genuine issues of material fact regarding whether the conduct was sufficiently severe or pervasive to alter the conditions of employment and create a hostile work environment. Id.

The court found that being raped by a business associate, while on the job, irrevocably alters the conditions of the victim's work environment, and that the employer's reaction to a single serious episode may form the basis for a hostile work environment claim. Id. at 967-968. The court found that because her employer effectively condoned the rape by a business colleague and its effects, the plaintiff was subjected to an abusive work environment that altered her working conditions. Id. at 968.

In Craig, the plaintiff was sexually harassed by her immediate supervisor over the course of several months. Craig, 2007 WL 2264635 at *1-2. The supervisor's conduct included the following: repeated inappropriate comments about her legs and how she should wear shorter skirts; during an after work meeting asking if she wanted to make love to him, telling her he would like to take off her dress, following her into the ladies room and kissing her as she came out of the stall, calling her at home that same night, one

week later calling her from the golf course telling her she was beautiful and asking her out for a drink, calling her from a hotel room in Wisconsin and repeatedly asking her if she would make love with him, later that month telling her that he wanted her and asking her if she remembered saying she wanted to make love to him, apologizing then two days later asking why she was cold and distant toward him, asking her if she remembered saying she wanted to make love to him, telling her he still had feelings for her but that he would leave her alone if she asked, telling her he didn't think he could work with her anymore, but never explicitly conditioning her continued employment on having a sexual relationship with him. Id.

In late August, plaintiff finally reported the incidents and the company took immediate action by instructing the supervisor to stay away from her and stop making sexual comments, having the supervisor report to another company official, appointing a senior executive to investigate the matter and then appointing the company's outside corporate counsel to investigate. Id. at *2. Plaintiff alleged that she gave corporate counsel the names of other women who were also harassed by the same supervisor, but that counsel did not follow-up on the leads or include that information in his report. Id.

After the investigation, corporate counsel recommended that: the company offer plaintiff and her husband counseling, the supervisor receive a severe reprimand putting him on notice that if

he engaged in the behavior again he would be fired, making the supervisor attend sexual harassment sensitivity training, and having all company managers and supervisors attend sexual harassment training in the near future. Id. In Late September, plaintiff was told the investigation was complete and she began reporting to the same supervisor again. Id. He engaged in retaliatory behavior. Id. Plaintiff alleged that because of the company's response was ineffective and her supervisor's repeated comments she began to get sick. Id. at *3. The company claimed that it could not transfer the supervisor or her to different offices, but did reassign some of her job functions. Id.

The court found that the supervisor's conduct was explicitly sexual in nature, unwelcome, and that the supervisor's conduct meet the requirements of being both objectively and subjectively abusive. Id. at *5. The court examined the severity of the conduct, the time period over which the plaintiff was subjected to the behavior, and found that a reasonable woman in the plaintiff's position could find that the behavior unreasonably interfered with work performance and could alter a condition of employment, thereby creating a hostile work environment. Id. at *6.

Plaintiff alleged her working conditions were altered when she was removed from many of her duties, received budgets late, had some of her duties reassigned, and was forced to continue interact with her supervisor despite his continued propositions. Id. The

REPORT AND RECOMMENDATION - 44

court found that, viewing the evidence in the light most favorable to plaintiff, she made out a prima facie case for a violation of Title VII.  Id.

The undisputed and admissible evidence shows that:

Plaintiff's claim for hostile work environment consists of Mr. Mathews being drunk at his home after work hours, straddling and rubbing against plaintiff in his boxer shorts while propositioning her, and trying to kiss her and that this behavior went on for approximately ten minutes.  Plaintiff had to push Mr. Mathews off her, she ran to the bathroom, he pursued her, pounded on the door, then he went to bed, and she left Mr. Mathews home.  After this September 10, 2003 incident, but before plaintiff complained to BLM supervisors, Mr. Mathews attempted to contact plaintiff approximately ten times by phone.

The BLM supervisors, after learning all the facts regarding the incident from Ms. Dolan, told Ms. Dolan to contact an EEO counselor and referred her to the employee assistance program, conducted an investigation, which resulted in Mr. Mathews being told not to have contact with Ms. Dolan, Mr. Mathews' mentor duties being removed, a five day suspension, and Mr. Mathews being required to go through alcohol treatment.  Ms. Dolan did not see or hear from Mr. Mathews again, Ms. Dolan requested a transfer from the Lakeview District, and Ms. Dolan's request for a transfer was granted.  The BLM prior to this incident had posted information

REPORT AND RECOMMENDATION - 45

regarding sexual harassment prevention and the BLM's anti-harassment policy in the Lakeview employee break room and Mr. Mathews was given training in preventing sexual harassment.

As addressed in footnote 33, plaintiff sets forth a number of contentions regarding how the terms and conditions of her employment were altered by Mr. Mathews' actions. The court carefully analyzed and rejected many of plaintiff's contentions, finding that they were not supported by the evidence in the record, did not constitute an alteration of her conditions of employment, or were based upon plaintiff's subjective beliefs that were not supported by personal knowledge, or were contradicted by the evidence in the record, and/or were based upon speculation.

The court has carefully analyzed plaintiff's remaining contentions regarding the changes in the terms and conditions of her employment and finds that plaintiff's case is similar to the situation in <u>Brooks</u>. Although the conduct by Mr. Mathews is certainly egregious and totally unacceptable, it was an isolated incident and it was never repeated. Ms. Dolan never saw or heard from Mr. Mathews after she complained to BLM supervisors about Mr. Mathews' conduct. The BLM conducted a prompt investigation, referred Ms. Dolan to an EEO counselor and the employee assistance program, Mr. Mathews was prohibited from having contact with Ms. Dolan, his mentor duties were removed, he was given a five day suspension and required to go to alcohol treatment in lieu of a 30

REPORT AND RECOMMENDATION - 46

day suspension.

The incident involved in this case was severe, however, as in Brooks, plaintiff has failed to produce sufficient evidence to raise a genuine issue of fact regarding the objective component of her hostile work environment claim and she has failed to present sufficient evidence from which a reasonable jury could find that plaintiff met the objective component of the test to show a hostile work environment - plaintiff has failed to show that the sexual harassment was sufficiently severe or pervasive to objectively alter the terms and conditions of her employment and constitute a hostile work environment.  See Brooks v. City of San Mateo, 229 F.3d 917, 921, 926 (and cases cited therein)(a reasonable woman in plaintiff's position would not consider the terms and conditions of her employment altered - plaintiff was harassment on a single occasion for a matter of minutes in a way that did not impair her ability to do her job in the long-term); See Kortan v. California Youth Authority, 217 F.3d 1104 (9th Cir. 2000)(supervisor's offensive comments were not sufficiently frequent, severe, or abusive to unreasonably interfere with plaintiff's employment, and discussing cases in which the court concluded a hostile environment existed); See Meriwether v. Caraustar Packing Co., 326 F.3d 990, 993 (8th Cir. 2003)(and cases cited therein)(single incident of grabbing a co-workers buttocks with force near the upper thigh and then two co-workers joking about it the next day did not rise to

REPORT AND RECOMMENDATION - 47

the level of severe or pervasive conduct); See Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993) (no actionable sexual harassment where supervisor asked plaintiff for dates, put his hand on her shoulder several times, placed "I love you" signs in her work area, and attempted to kiss her in a bar); See Saxton v. American Telephone & Telegraph Co., 10 F.3d 526, 528, 534-535 (7th Cir. 1993)(no actionable sexual harassment where supervisor placed his hand on plaintiff's leg above the knee several times, rubbed his hand along her inner thigh once, and pulled her into the doorway and kissed her for several seconds). Therefore, defendants are entitled to summary judgment on plaintiff's Title VII hostile work environment claim.

**Retaliation Claims**

To make out a prima facie case of retaliation, plaintiff must show: 1) she was engaged in a protected activity; 2) there was an adverse employment decision; and 3) a causal link between the protected activity and the adverse employment decision. Raad v. Fairbanks North Star Borough School Dist., 323 F.3d 1185, 1196-1197 (9th Cir. 2003), opinion amend on denial of rehearing, 2003 WL: 21027351 (9th Cir.); Wallis v. J.R. Simplot, 26 F.3d 885, 891 (9th Cir. 1994). Causation, sufficient to establish a prima facie case of unlawful retaliation, may be inferred from the proximity in time between the protected action and the alleged retaliation. Raad, 323 F.3d at 1197; Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.

1987); <u>Miller v. Fairchild Industries, Inc.</u>, 797 F.2d 727, 731 (9th Cir. 1986)(citations omitted).  A plaintiff may prove causation also by presenting direct evidence of a retaliatory motive.  <u>Id</u>.

The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981).  The burden of production, not the burden of persuasion, then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action.  <u>Id</u>. at 253. The defendant must set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not  the cause of the employment action.  <u>Id</u>. at 253-254.

The  <u>McDonnell Douglas</u> presumption shifts the burden of production to the defendant, but the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against plaintiff remains with the plaintiff.  <u>Id</u>.  If the defendant meets its burden of production, the presumption raised by the prima facie case is rebutted.  <u>Id</u>. at 255.  The burden then returns to the plaintiff to prove that the articulated reason is a pretext for discrimination.  <u>Id</u>. at 253.

Even if the plaintiff proves that the reason was a pretext, the plaintiff must still show that the defendant intentionally

retaliated against her based on her protected activity.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515-516 (1993).  The burden of proving that the proffered reasons were just a pretext for retaliation merges with the ultimate burden of persuading the trier of fact that the plaintiff has been the victim of intentional retaliation.  Id.  The ultimate question is whether it is more likely than not that the employer's action was motivated by intentional retaliation.  See U.S. Postal Service Board of Gov. v. Aikens, 460 U.S. 711, 716 (1983).

If at the end of the defendant's case, plaintiff has established a prima facie case, and the defendant has failed to meet its burden of production, the court must award a judgment to the plaintiff as a matter of law, but only if there is a finding of intentional retaliation.  St. Mary's, 509 U.S. at 508-514.  If the defendant has sustained its burden, but reasonable minds could differ as to whether a preponderance of the evidence establishes the facts of a prima facie case, then a question of fact remains, which the trier of fact will be called upon to answer.  Id.  If the defendant succeeds in carrying its burden of production, the McDonnell Douglas framework is no longer relevant.  Id. at 510.

Once defendant's production is made, the trier of fact proceeds to decide the ultimate question of whether the plaintiff has proven the defendant intentionally retaliated against him/her because of engaging in the protected activity.  Burdine, 450 U.S.

at 253. The fact finder's disbelief of the reasons put forward by the defendant may, together with plaintiff's prima facie case, suffice to show intentional retaliation. St. Mary's, 509 U.S. at 511. Rejection of defendant's proffered reasons, will permit the trier of fact to infer intentional retaliation, but it does not compel judgment for the plaintiff. Id. The plaintiff still bears the ultimate burden of persuading the trier of fact that the defendant intentionally retaliated. Id.

Plaintiff's complaint alleges that she was retaliated against in the form of her discharge from the SCEP program for filing the December 2003 EEO complaint. In her response brief, she also contends that her transfer to another district and her delayed placement were also acts of retaliation. A plaintiff is not allowed to add new claims not included in the complaint through briefing on a motion for summary judgment. Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004). Therefore, the court will not consider these two claims.

Plaintiff has not produced any direct evidence of a retaliatory motive. There is no temporal proximity between plaintiff's termination from the SCEP program and her EEO complaint. Plaintiff has failed to produce any evidence of causation regarding her termination from the SCEP program. See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002)(18 month lapse between protected activity and adverse

REPORT AND RECOMMENDATION - 51

employment action is too long by itself to give rise to an inference of causation). Therefore, defendants are entitled to summary judgment on plaintiff's retaliation claims.

As an alternative basis for granting defendants' motion on plaintiff's retaliation claims, the court finds that the BLM had a legitimate reason for terminating plaintiff from the SCEP program. Plaintiff failed to attend school which was a requirement of the SCEP program. Plaintiff has failed to present any evidence demonstrating that this reason was a pretext for discrimination.

## IV. **RECOMMENDATION**

Based on the foregoing, it is recommended that defendants' motion for summary judgment (#69) be granted and this case dismissed.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals*. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. *Objections to this Report and Recommendation, if any, are due by October 3, 2007. If objections are filed, any responses to the objections are due 14 days after the objections are filed*. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate

review of the findings of fact in an order or judgment entered

pursuant to the Magistrate Judge's recommendation.


          DATED this ___19____ day of September, 2007.



     _____/s/_____
               Mark D. Clarke
               United States Magistrate Judge